Ronald Abramson
David G. Liston
**LEWIS BAACH pllc**
The Chrysler Building
405 Lexington Avenue
New York, NY 10174
Tel: (212) 826-7001

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **WAG ACQUISITION, L.L.C.**, | Case No.: **2:14-cv-3456-ES-JAD** |
| Plaintiff, | |
| v. | |
| **FRIENDFINDER NETWORKS INC.**; | |
| **STREAMRAY INC.**; and | **FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT AND DEMAND FOR JURY TRIAL** |
| **DOES 1-20**, | |
| Defendants. | |

Plaintiff WAG ACQUISITION, L.L.C., for its First Amended Complaint against

Defendants, alleges infringement of United States Patent Nos. 8,122,141, 8,327,011,

8,185,611, and 8,364,839 (the "patents-in-suit").  Defendants, who are the

successors to Penthouse® Media Group, operate a series of leading Internet

"webcam" sites, including without limitation the cams.com video chat site (dubbed

the "Official Cam Site of Penthouse Pets") and penthouse.com "Live Model Chat."

Plaintiff alleges that Defendants, operating without authority or license, rely on

Plaintiff's patented streaming technology to conduct this business, thereby

infringing Plaintiff's patents.  Plaintiff seeks appropriate compensation for Defendants' infringement.

## THE PARTIES

1.      Plaintiff WAG ACQUISITION, L.L.C. is a New Jersey limited liability company with its principal place of business at 3 Gold Mine Road, Suite 104, Flanders, New Jersey 07836.

2.      On information and belief, Defendant FRIENDFINDER NETWORKS INC. ("FFN") is a California corporation with its principal place of business at 220 Humboldt Court, Sunnyvale, California 94089.  On information and belief, FFN is doing business under a number of trade names, including without limitation Penthouse, Various, Inc., Friend Finder, Adult Friend Finder, and Cams.com.

3.      On information and belief, Defendant STREAMRAY INC. ("Streamray") is a California corporation with its principal place of business at 220 Humboldt Court, Sunnyvale, California 94089.

4.      On information and belief, Defendants DOE 1 – DOE 20 are entities whose precise identities are unknown to Plaintiff at this time, which operate in concert with Defendants FFN and Streamray in connection with the conduct complained of herein.  Plaintiff believes that information obtained in discovery will lead to identification of each such Defendant's true identity and permit Plaintiff to amend this complaint to state the same.

## JURISDICTION AND VENUE

5.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the patent laws of the United States, 35 U.S.C. §§ 1 *et seq*.

6.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)-(c) and 1400(b).

## PLAINTIFF'S BUSINESS AND DEVELOPMENTS

7.      Plaintiff, operating under the trade name SurferNETWORK, is in the business of providing Internet broadcasting services for live and on-demand audio and video program material.  Plaintiff began this business in 1998 and has been one of the leading providers of such services to the terrestrial radio stations and other content providers that comprise its customer base.

8.      Early in developing its business, two of Plaintiff's principals, William A. Grywalski ("Grywalski") and Harry Emerson ("Emerson"), recognized a need that existed in the field of Internet delivery of broadcast media due to the shortcomings in the then current Internet streaming technologies.  They observed that long startup delays due to "buffering" and frequent program interruptions (sometimes referred to as "jitter") made the experience of trying to listen to or view streaming Internet content frustrating to the end user, and therefore impractical as a content delivery mechanism.  They were interested in making the Internet streaming experience more like radio or television, including the immediacy of having the programming appear to start instantly on demand (*e.g.*, turning on a radio or flipping channels), and continue playing once started without random interruptions.

9.      Plaintiff engaged the assistance of a software design engineer, Harold Price ("Price"), to develop solutions for the shortcomings that Grywalski and Emerson saw in the then current technology, with respect to streaming media playback performance, as well as other technological issues concerning Internet delivery of broadcast media.  Price worked on several aspects of this matter for Plaintiff over the period 1999-2001.

10.     Price was aware of the then current approach to streaming, which attempted to overcome streaming transmission delays and jitter by a variety of techniques, including, for example, establishing a content buffer of 20-seconds or so in duration, on the receiving (user or "client") end of the communication, within the client's media player or media player browser plugin.  After the user selected (*e.g.*, clicked on) a stream, the player would start filling this buffer at the playback rate and then start playing when the buffer was full.  While this method did provide some protection against interruptions for the duration of whatever content was initially buffered, it entailed an undesirable startup delay for "buffering," and provided no means for graceful recovery once the 20 seconds worth of content in the buffer was consumed.

11.     Price conceived of solutions to these problems.  He built a prototype that implemented one embodiment of those solutions, and he demonstrated that a system according to his new design could overcome the problems put to him by Grywalski and Emerson.

12.     Plaintiff and its predecessors in interest filed a number of U.S. patent applications on these solutions, as enumerated below.  To date, this family of patent

applications has resulted in seven issued U.S. patents, including the patents-in-suit.
All of these patent applications were assigned to Plaintiff, or to a predecessor-in-
interest of Plaintiff and reassigned to Plaintiff.

13.  Plaintiff has been conducting an active, operating business ever since
the developments described above, and has actively practiced technology taught in
the patents-in-suit, from then to the present.   Plaintiff has developed commercial
arrangements under which it streams content for numerous terrestrial radio
stations and content providers in New Jersey, regionally, nationally, and
internationally.  It also provides a One-Click Royalty Reporter™ for radio stations to
report streaming media performance royalty information to SoundExchange (a
performing rights organization that collects royalties on behalf of sound recording
copyright owners ), among other services.

## DEFENDANTS' BUSINESS ACTIVITIES

14.  Defendants are the result of a 2005 business combination between the
Penthouse enterprise and Streamray, a Silicon Valley adult webcam enterprise.  On
information and belief, based on published interviews with FFN executives, the
combined enterprise now operates in a unitary manner as "FriendFinder Networks,"
running various online dating sites as well as the aforementioned webcam sites.

15.  Defendants operate or provide streaming technology for numerous web
sites that provide live interactive webcam performances, including (among others)
cams.com, icams.com, stripshow.com, xhookups.com, adultfriendfinder.com, and
penthouse.com.  Defendants' web sites stream a large volume of live, paid, on-
camera sex performances, rendered by "webcam models" (performers) recruited in

volume by Defendants from dozens of countries around the world.  Defendants' live streaming also includes video "chat" sessions on Defendants' numerous dating match web sites and "premium" performances by models on Defendants' penthouse.com web site.

**Defendants' Business Activities**

16.    Defendants, who claim to have 16 active webcam sites, over 14,000 performers, and more than 8 million active members, stream live adult webcam performances over the Internet in extremely high volume.  Though limited "free" viewing is available on some of Defendants' web sites, Defendants charge for most services.  Live performances are priced to users of Defendants' web sites at various pricing levels, ranging from approximately $1.50 to $5.00 per minute.  Users of Defendants' web sites pay for these services with their credit cards.  On information and belief, this activity results in net revenues to Defendants (after revenue-split payments to the performers and to marketing affiliates) of hundreds of millions of dollars per year.

17.    Since Defendants also are involved in online dating, they feature location-based, personalized presentations.  Viewing Defendants' web sites from a computer or mobile device in proximity to this Court readily shows numerous online performers from this District.  Such performers perform from New Jersey over network facilities provided by Defendants.  On information and belief, a proportionate (and considerable) amount of Defendants' revenues are derived from performers in New Jersey.

18.     Defendants provide an "Affiliate" program, under which Defendants'
webcam sites can be adapted ("white labeled") for other Internet service providers
on a revenue-splitting basis, or simply linked to, on a similar basis.  These Affiliate
sites include white-labeled sites associated with pornographic "Tube" (Youtube-
style) sites.  The "Tube" sites offer short, low-quality, prerecorded clips on a free
basis.  The associated co-branded or white-labeled "Cam" sites (provided by
Defendants) provide a paid, revenue-generating webcam adjunct service under the
Tube site provider's own branding.  The live webcam Affiliate site will appear to the
user of the Tube site as a click-through site or in a window that pops over the Tube
site.  Though branded and decorated to look like the Tube site, the Affiliate site is
actually served from facilities operated by the Defendants herein.  The Affiliate site
provider and the Defendants split the revenue resulting from the Affiliate site
activity, in accordance with the terms of Defendants' Affiliate program.

**Defendants' Internet Operations**

19.     Defendants' business success is attributable in substantial part to
Defendants' technological capability to deliver streaming media content in a
responsive, smooth, and scalable manner, such as made possible by Plaintiff's
patents.

20.     Defendants derive great value as a result of operating under Plaintiff's
patented technology, for which they have not compensated Plaintiff.

21.     Defendants have deployed a substantial computer and network
infrastructure to receive webcam feeds from Defendants' numerous live performers
and redistribute these feeds in real time to large audiences.  Defendants stream the

videos using at least two different delivery schemes (as will be addressed in greater detail below) to diverse user equipment, including, *inter alia*, desktop computers and mobile devices (collectively referred to herein as "Players").

22.    Defendants' services on the Internet are provided by computers, referred to as "servers."  Each such server is reachable over the Internet by its "address" on the Internet, referred to as its Internet Protocol (IP) address.  Every device publicly accessible on the Internet has its own globally unique (*i.e.*, non-duplicated) IP address.

23.    IP addresses are represented as a four-part string of numbers, in the format of four numbers, each in the range 0-255, separated by dots – as in, for example, 192.22.245.2 – resembling a telephone number.  To make the Internet addressing system more user-friendly, the numeric IP addresses are often given names ("domain names"), such as google.com or ebay.com, so that users can reach the desired services by a memorable name, rather than a number (*e.g.*, www.google.com as opposed to 74.125.228.80).  An Internet mechanism called the Domain Name Service (DNS) maps the domain names to the numeric IP addresses of the machines that serve content for the domains, so that the requests directed to domain names (*e.g.*, google.com) will reach the proper numerical IP addresses (in this example, 74.125.228.80), and thereby the proper servers.  "Subdomains" may also be assigned within individual domains, for example, **www**.google.com, **mail**.google.com, **voice**.google.com, etc.  Each subdomain represents a different server reachable through the main domain (google.com), but mapped to a separate IP address.  (That is, the subdomain mail.google.com (aka "gmail") maps to

74.125.228.246, as opposed to the 74.125.228.80 address for main google.com search engine site.)

24.    Internet domain names and IP addresses are given out, generally in "blocks" of multiple adjacent addresses, by a process that involves registration with accredited registrars.

25.    A given IP address will be assigned to a registrant at a listed business address, but the use of the IP address is not tied to the location of the registrant's business address.  The registrant can locate its servers anywhere it wishes, geographically, and use the IP addresses it owns (or rents) to identify those servers on the Internet.  The physical location of the server will bear upon the speed at which content can be delivered to users.  Generally, the closer the server is to the user, the better the delivery will be.  In high-volume operations, where performance is important, multiple servers may be deployed over a "Content Distribution Network" (CDN), in a manner such that individual users will be directed to different servers based on their proximity to the respective servers.

26.    The web site www.cams.com serves content for the primary web page at the Defendants' domain cams.com.  The domain cams.com is registered in the name of Defendant Streamray.  The IP address associated with www.cams.com (and cams.com itself) is 208.88.177.22, which is in the IP address block 208.88.176.0/21, registered to Defendant FFN.  In other words, Defendant Streamray nominally provides the domain, and Defendant FFN provides the Internet address on which the domain operates.  On information and belief, a similar pattern exists for the majority of Defendants' other accused web sites.

27.   When a user visiting cams.com (for example) clicks on the live stream of an individual performer, the streaming video for the performance is served, in a manner invisible to the ordinary user, from a server not associated with any domain name, at another IP address, also in the above-noted 208.88.176.0/21 address block, belonging to FFN.

28.   Content is served from this FFN address block from different IP addresses – and different physical servers – depending on the identification of the type of Player requesting the stream.

29.   For certain types of Players, including without limitation certain mobile platforms, the streams for Defendants' web sites originate in the United States from IP addresses of FFN, including without limitation 208.88.176.140.  These streams use a protocol that causes Defendants to infringe Plaintiff's '141 and '011 patents as alleged in Counts I-IV below.

30.   For other types of Players, including without limitation certain "Desktop" platforms, the streams from Defendants' sites are served via the RTMP protocol, in a manner that causes Defendants to infringe Plaintiff's '611 and '839 patents as alleged in Counts V and VI below.  These streams also originate in the United States from IP addresses of FFN, including without limitation 208.88.176.148, 208.88.176.141, 208.88.176.147, and 208.88.177.222.

31.   Defendants have taken strong measures to promote the use of their sites on mobile devices.  The home pages of Defendants' webcam sites all provide a prominent link announcing that these sites are "Now on Mobile."  Defendants provide special versions of their sites, optimized for mobile use, such as

"tabletsexchat.com," "m.cams.com," "nymphocam.net/?mobile=1," etc., served from FFN's IP addresses such as 208.88.177.82. Defendants take further measures to drive traffic to these sites with suggestions such as "Check Out PenthouseCams.com Mobile."

32.    On information and belief, each and every streaming video delivery by Defendants to users in this District, and elsewhere throughout the United States, infringes one or more claims of the patents-in-suit, as set forth in detail below.

### THE PATENTS-IN-SUIT

33.    The patents-in-suit comprise the following United States Patents, which were duly and legally issued on the dates indicated:

| Pat. No. | Issued | Title | Reference |
|----------|--------|-------|-----------|
| 8,122,141 | Feb. 21, 2012 | STREAMING MEDIA BUFFERING SYSTEM | '141 patent |
| 8,327,011 | Dec. 4, 2012 | STREAMING MEDIA BUFFERING SYSTEM | '011 patent |
| 8,185,611 | May 22, 2012 | STREAMING MEDIA DELIVERY SYSTEM | '611 patent |
| 8,364,839 | Jan. 29, 2013 | STREAMING MEDIA DELIVERY SYSTEM | '839 patent |

34.    The patents-in-suit were developed in the course of Plaintiff's business and were assigned by Price (the inventor) to Plaintiff's predecessors in that business, which reassigned them to Plaintiff, the current operator of the business. Plaintiff owns all rights to recover for past and ongoing infringement of the patents-in-suit.

## Notice of the Patents-In-Suit and Infringement Thereof

35.   Pursuant to 35 U.S.C. § 287(a), Defendants had notice of the patents-in-suit, and of their manner of infringement thereof, by reason of the filing of this action on May 30, 2014.

36.   Further, on May 30, 2014, Plaintiff sent a letter (the "Demand Letter") to Defendant FFN, also giving notice of the patents-in-suit and of the manner in which Defendants infringe those patents.  The Demand Letter also enclosed a complete copy of the Complaint.  On information and belief, Defendant FFN received the Demand Letter (with the copy of the Complaint) within 3-5 days after it was sent.

37.   Defendants FFN and Streamray were duly served in this action on June 3, 2014, by personal delivery to Defendants' registered agent.

38.   The earliest of the dates alleged in Pars. 35-37 by which Defendants had notice of the patents-in-suit and of their infringement thereof is herein referred to (separately as to each Defendant, to the extent, if any, that different Defendants may have received such notice on different dates) as the "Notice Date."

### COUNT I: DIRECT INFRINGEMENT OF THE '141 PATENT

39.   Plaintiff repeats and realleges the allegations of paragraphs 1- 38 above as if fully set forth at length herein.

40.   35 U.S.C. § 271(a) provides in pertinent part as follows:

> "(a) . . . whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent."

41.   Defendants, acting together as alleged above, have directly infringed and are still directly infringing the '141 patent by making, selling, offering to sell, performing, and using apparatus and methods that embody one or more claims thereof, by conduct including without limitation the acts alleged in the paragraphs that follow.

42.   As alleged above, Defendants provide their services through an Internet server infrastructure located in the United States.  Defendants' direct infringement results from the operation of the servers referenced in Par. 29 above, which serve the content for Defendants' accused infringing web sites.  Such infringement results because, *inter alia*, claims 10-17, 19 and 21-23 of the '141 patent read on those servers and their software, and defendants make and use those servers and their software.

43.   More particularly, Defendants' servers referenced in Par. 42 include servers that use the same "divide and conquer" approach described in the '141 patent to deliver streaming data.  Defendants' servers assign serial identifiers to sequential media data elements comprising the stream.  The servers receive, from users, requests for these elements.  The requests identify the requested data elements by the serial identifiers.  The servers then serve the elements in response to the requests.  This mechanism provides for a fast start of streaming playback, and at the same time allows the Player to moderate media flow by "pulling" data as needed, based on its own rate of consuming content.  Defendants' servers incorporate each and every element of claims 10-17 of the '141 patent and are

therefore infringing.  By operating such servers, Defendants directly infringe claims 10-17 of the '141 patent.

44.    Claims 19 and 21-23 of the '141 patent concern computer software that runs servers such as Defendants' servers described in Par. 43.  The software that operates Defendants' servers meets each and every limitation set forth in claims 19 and 21-23 of the '141 patent and is therefore infringing.  By operating said servers, and thereby using such computer programs, Defendants directly infringe claims 19 and 21-23 of the '141 patent.

45.    Claims 1-8 and 28 of the '141 patent concern providing a server essentially as described in Par. 43, as well as software ("Player Software") to run the Players.  The Player Software causes Players to request the data elements from the servers, by their identifiers, and to maintain a record of the data elements already received.  Defendants provide servers that meet the first set of requirements recited in these claims.  Through such servers, in response to requests identified as from certain types of Players, Defendants direct and control users' Players (as further alleged below) to provide Player Software in accordance with the second set of requirements recited in these claims.  By performing these steps (which together comprise all of the steps of the claims), Defendants thereby directly infringe claims 1-8 and 28 of the '141 patent.

46.    More particularly, Defendants, through their servers, direct and control users' Players as alleged in Par. 45 by, including without limitation, the following acts.  Defendants' servers read encoded information in network packets received from Players and identify the type of Player that sent the packet.  When Defendants

identify a Player as compatible with Defendants' video stream, Defendants' servers send such Players electronic instructions that cause the Players, without any user intervention, to load and execute the Player Software (thereby putting the Players and Player Software into service), so that the Player may then request and receive the serialized streaming transmissions from Defendants' servers.  Defendants' servers also send electronic data to the Players containing the serial identifiers used by the Players to request streaming media elements, thereby further controlling the operation of the Players.

47.    Further in the alternative, and without limiting any of the foregoing allegations, Defendants also directly infringe claims 1-8 and 28 of the '141 patent under 35 U.S.C. § 271(a) by Defendants' acts combined with those of their users, with knowledge that each step of said patented methods will be performed through the combined action of Defendants and the user.

48.    Claims 24-27 of the '141 patent concern Player Software.  Defendants directly infringe claims 24-27 of the '141 patent by using (as alleged below) the Player Software claimed in said claims, which Plaintiff alleges meets each and every limitation set forth in said claims and is infringing, and by directing and controlling (as further alleged below) users' use of such infringing Player Software.

49.    Defendants use infringing Player Software and thereby directly infringe claims 24-27 of the '141 patent by putting the Player Software into service as alleged in Par. 46 and making beneficial use of the Player Software by using the Player Software as part of a delivery mechanism whereby Defendants deliver their streaming video content to end users through the users' Players.

50.    In the alternative, and without limiting the foregoing, Defendants also directly infringe claims 24-27 of the '141 patent by directing and controlling users' Players to use infringing Player Software in the manner alleged in Par. 46.

51.    Plaintiff is entitled to recover all past, present, and ongoing damages it has sustained as a result of Defendants' direct infringement of the '141 patent.

52.    Pursuant to 35 U.S.C. § 284, Plaintiff is entitled to not less than a reasonable royalty for the use made by the Defendants under the '141 patent, in an amount subject to proof at trial, together with interest and costs as fixed by the Court.

## COUNT II: INDUCED INFRINGEMENT OF THE '141 PATENT

53.    Plaintiff repeats and realleges the allegations of paragraphs 1-52 above as if fully set forth at length herein.

54.    35 U.S.C. § 271(b) provides:

> "Whoever actively induces infringement of a patent shall be liable as an infringer."

55.    In addition and in the alternative to Plaintiff's allegations of direct infringement of claims 24-27 of the '141 patent, and without limiting anything alleged in connection therewith, Plaintiff alleges that Defendants, by conduct more particularly alleged in the paragraphs that follow, also actively induce infringement, by users, of claims 24-27 of the '141 patent.

56.    The Player Software meets each and every limitation of claims 24-27 of the '141 patent, and is therefore infringing.  When users use the infringing Player Software, they directly infringe claims 24-27 of the '141 patent.

57.     Defendants actively induce such direct infringement by users in a number of ways, including without limitation the following acts.  Defendants, through their servers, as aforesaid, provide to users video streams that are especially adapted to be viewed on Players running compatible Player Software, thereby inducing users to use such Players and such software.  Defendants' servers provide such streams when they identify that the user is using compatible Player Software.  These streams provide a superior viewing experience that further induces the user to use Players running such Player Software when they use Defendants' service.  Defendants' servers send electronic instructions causing the Players to load and execute compatible Player Software, and electronic data containing the serial identifiers for the Players to use to request sequential media data elements.

58.     In addition, as alleged in Par. 31, Defendants take strong steps to induce users to try viewing their sites with infringing Players and Player Software, and provide them with an experience optimized for these devices (as alleged in Par. 57) when they do so.

59.     The users of such Players are thereby induced by Defendants to directly infringe claims 24-27 of the '141 patent (*e.g.*, by using Player Software within the scope of said claims, whereby said users directly infringe such claims as aforesaid).

60.     As a consequence of the foregoing, since at least as early as the Notice Date, Defendants have engaged in such inducement  with knowledge of the '141 patent; with knowledge that users' Players use Player Software meeting the limitations of claims 24-27 of the '141 patent; with knowledge that the users

directly infringe claims 24-27 of the '141 patent when they use Player Software; with knowledge of how Defendants' conduct actively induces users to use infringing Player Software and thereby infringe the '141 patent; and with the specific intent to cause such infringement, knowing that the users' acts constitute direct infringement of the '141 patent.

61.    Plaintiff is entitled to recover all damages it has sustained since at least as early as the Notice Date, and all such ongoing damage, as a result of Defendants' induced infringement of the '141 patent.

62.    Pursuant to 35 U.S.C. § 284, Plaintiff is entitled to not less than a reasonable royalty for Defendants' induced infringement of the '141 patent, in an amount subject to proof at trial, together with interest and costs as fixed by the Court.

## COUNT III: DIRECT INFRINGEMENT OF THE '011 PATENT

63.    Plaintiff repeats and realleges the allegations of paragraphs 1- 62 above as if fully set forth at length herein.

64.    Defendants, acting together as alleged above, have directly infringed and are still directly infringing the '011 patent by using Players that embody one or more claims of the '011 patent by conduct including without limitation the acts alleged in the paragraphs that follow.

65.    Defendants infringe such claims directly, (i) by using said Players, which Plaintiff alleges meet each and every limitation set forth in said claims and are infringing, and (ii) by directing and controlling users' use of such infringing Players.

66.    Defendants use infringing Players and thereby directly infringe claims 1-4 of the '011 patent by putting the Players into service as alleged in Par. 46 and making beneficial use of the Players by making the Players part of a delivery mechanism whereby Defendants deliver their streaming video content to end users.

67.    Defendants direct and control users' Players by, including without limitation, the following acts.  Defendants' servers read encoded information in network packets received from Players and identify the type of Player that sent the packet.  When Defendants identify a Player as compatible with Defendants' video stream, Defendants' servers send such Players electronic instructions that cause the Players, without any user intervention, to load and execute the Player Software (thereby putting the Players and Player Software into service), so that the Player may then request and receive the serialized streaming transmissions from Defendants' servers.  Defendants' servers also send electronic data to the Players containing the serial identifiers used by the Players to request streaming media elements, thereby further controlling the operation of the Players.

68.    Plaintiff is entitled to recover all past, present, and ongoing damages it has sustained as a result of Defendants' direct infringement of the '011 patent.

69.    Pursuant to 35 U.S.C. § 284, Plaintiff is entitled to not less than a reasonable royalty for the use made by the Defendants under the '011 patent, in an amount subject to proof at trial, together with interest and costs as fixed by the Court.

### COUNT IV: INDUCED INFRINGEMENT OF THE '011 PATENT

70.    Plaintiff repeats and realleges the allegations of paragraphs 1-69 above as if fully set forth at length herein.

71.    In addition and in the alternative to Plaintiff's allegations of direct infringement of claims 1-4 of the '011 patent, and without limiting anything alleged in connection therewith, Plaintiff alleges that Defendants, by conduct more particularly alleged in the paragraphs that follow, also actively induce infringement, by users, of claims 1-4 of the '011 patent.

72.     The users' Players meet each and every limitation of claims 1-4 of the '011 patent and are therefore infringing.  When users use such infringing Players, they directly infringe claims 1-4 of the '011 patent.

73.    Defendants actively induce such direct infringement by users in a number of ways, including without limitation the following acts.  Defendants, through their servers, as aforesaid, provide to users video streams that are especially adapted to be viewed on Players running compatible Player Software, thereby inducing users to use such Players.  Defendants' servers provide such streams when they identify that the user is using a compatible Player.  These streams provide a superior viewing experience that further induces the user to use such Players when they use Defendants' service.  Defendants' servers send electronic instructions causing the Players to load and execute compatible Player Software, and electronic data containing the serial identifiers for the Players to use to request sequential media data elements.

74.    In addition, as alleged in Par. 31, Defendants take strong steps to induce users to try viewing their sites with infringing Players and Player Software, and provide them with an experience optimized for these devices (as alleged in Par. 73) when they do so.

75.    The users of such Players are thereby induced by Defendants to directly infringe claims 1-4 of the '011 patent (*e.g.*, by using Players within the scope of said claims, whereby said users directly infringe such claims).

76.    As a consequence of the foregoing, since at least the Notice Date, Defendants have engaged in such inducement  with knowledge of the '011 patent; with knowledge that users' Players use Player Software meeting the limitations of claims 1-4 of the '011 patent; with knowledge that the users directly infringe claims 1-4 of the '011 patent when they use Player Software; with knowledge of how Defendants' conduct actively induces users to use infringing Players and thereby infringe the '011 patent; and with the specific intent to cause such infringement, knowing that the users' acts constitute direct infringement of the '011 patent.

77.    Plaintiff is entitled to recover all damages it has sustained since at least as early as the Notice Date, and all such ongoing damage, as a result of Defendants' induced infringement of the '011 patent.

78.    Pursuant to 35 U.S.C. § 284, Plaintiff is entitled to not less than a reasonable royalty for Defendants' induced infringement of the '011 patent, in an amount subject to proof at trial, together with interest and costs as fixed by the Court.

## COUNT V: DIRECT INFRINGEMENT OF THE '611 PATENT

79.    Plaintiff repeats and realleges the allegations of paragraphs 1-78 above as if fully set forth at length herein.

80.    Defendants, acting together as alleged above, have directly infringed and are still directly infringing the '611 patent by making, selling, offering to sell, performing, and using apparatus and methods that embody one or more claims thereof, by conduct including without limitation the acts alleged in the paragraphs that follow.

81.    Among the servers that Defendants operate are servers that employ the buffering (temporary storage) scheme claimed in the '611 patent, to control transmission of streaming media to achieve fast startup of the playback and rapid recovery from interruptions.  Those servers send initial streaming media elements to Players at an initial sending rate more rapid than the playback rate of the media stream to fill a buffer in the user's Player, and thereafter send further streaming media data elements to the Player at about the playback rate.  Defendants' servers perform these functions in a manner that meets each and every limitation of one or more claims of the '611 patent, thereby directly infringing the '611 patent.

82.    Plaintiff is entitled to recover all past and continuing damages so sustained by Plaintiff as a result of such infringement.

83.    Pursuant to 35 U.S.C. § 284, Plaintiff is entitled to not less than a reasonable royalty for the use made by the Defendants under the '611 patent, in an amount subject to proof at trial, together with interest and costs as fixed by the Court.

## COUNT VI: DIRECT INFRINGEMENT OF THE '839 PATENT

84.    Plaintiff repeats and realleges the allegations of paragraphs 1-83 above as if fully set forth at length herein.

85.    Defendants, acting together as alleged above, have directly infringed and are still directly infringing the '839 patent by making, selling, offering to sell, performing, and using apparatus and methods that embody one or more claims thereof, by conduct including without limitation the acts alleged in the paragraphs that follow.

86.    Among the servers that Defendants operate are servers that employ a buffering scheme as claimed in the '839 patent, to control transmission of streaming media to achieve fast startup of the playback and rapid recovery from interruptions. Those servers load a buffer on the server with streaming media data elements, send an initial amount of streaming media elements to Players at an initial sending rate more rapid than the playback rate, and thereafter send further streaming media data elements to the Player at about the playback rate.  Defendants' servers perform these functions in a manner that meets each and every limitation of one or more claims of the '839 patent, thereby directly infringing the '839 patent.

87.    Plaintiff is entitled to recover all past and continuing damages so sustained by Plaintiff as a result of such infringement.

88.    Pursuant to 35 U.S.C. § 284, Plaintiff is entitled to not less than a reasonable royalty for the use made by the Defendants under the '839 patent, in an amount subject to proof at trial, together with interest and costs as fixed by the Court.

## COUNT VII: WILLFUL INFRINGEMENT

89.    Plaintiff repeats and realleges the allegations of paragraphs 1- 88 above as if fully set forth at length herein.

90.    35 U.S.C. § 284 provides in pertinent part as follows:

"When the damages are not found by a jury, the court shall assess them. In either event the court may increase the damages up to three times the amount found or assessed."

91.    35 U.S.C. § 285 provides as follows:

"The court in exceptional cases may award reasonable attorney fees to the prevailing party."

92.    From at least the Notice Date, Defendants knew of Plaintiff's patents, therefore should have known what the claims of those patents covered, and should have understood that their own activities as alleged herein created an objectively high likelihood of infringement of valid patents.

93.    Notwithstanding possession of such knowledge for several months, on information and belief, Defendants have continued their infringing conduct without modification or moderation, without compensation to Plaintiff, and without any legal justification, thereby demonstrating their indifference to legal obligations and the property rights of others, and their reckless disregard for Plaintiff's patents, and/or their intentional infringement thereof.

94.    Defendants' continued infringement since at least the Notice Date is willful and deliberate, entitling Plaintiff to increased damages under 35 U.S.C. § 284.

95.    Defendants' continued reckless or intentional infringement since at least the Notice Date renders this an extraordinary case under 35 U.S.C. § 285, which entitles Plaintiff to an award of reasonable attorneys' fees.

96.    Plaintiff has no available injunctive remedy at this time to mitigate Defendants' continued willful infringement.  Plaintiff provides a "business-to-business" (B2B) service to content providers, and in particular radio station operators, whereas Defendants operate as direct content providers for consumers or "business-to-consumer" (B2C) services.  Accordingly, despite a high probability of success on the merits, the non-competitive current positioning of the parties cuts against the availability of preliminary injunctive relief, not because of any shortcomings on the merits, but rather because of factors concerning irreparable harm unrelated to the merits.  Plaintiff thus lacks an adequate remedy by way of a preliminary injunction to prevent ongoing willful infringement by the Defendants. Not imposing liability for willful infringement for the Defendants' continued infringing conduct would allow Defendants to continue their knowing infringement with impunity, at no additional cost, and would be unjust.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands trial by jury on all issues.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff WAG ACQUISITION, L.L.C. requests an entry of judgment in its favor and against Defendants as follows:

a) Declaring that each of the Defendants has and/or continues to directly infringe and/or induce infringement of one or more claims of United States Patent Nos. 8,122,141, 8,327,011, 8,185,611, and 8,364,839;

b) Declaring that each of Defendants' infringement has been willful, and awarding enhanced damages at least from the Notice Date as a result of that willfulness under 35 U.S.C. § 284, jointly and severally against the Defendants;

c) Awarding the past and continuing damages arising out of Defendants' direct infringement of United States Patent Nos. 8,122,141, 8,327,011, 8,185,611, and 8,364,839 and damages at least from the filing of this action and/or receipt of the Demand Letter for Defendants' indirect infringement as alleged herein, to Plaintiff, together with prejudgment and post-judgment interest, in an amount according to proof, jointly and severally against the Defendants;

d) Awarding attorneys' fees, costs, or other damages pursuant to 35 U.S.C. §§ 284 or 285 or as otherwise permitted by law, jointly and severally against the Defendants;

e) Upon the final judgment of infringement herein, entering an order, pursuant to 35 U.S.C. § 283, permanently enjoining and restraining Defendants and their respective officers, directors, principals, agents, servants, employees, successors and assigns, and all those in active concert or participation with each of the foregoing, from infringing and/or from inducing the infringement of any claims of United States Patent Nos. 8,122,141, 8,327,011, 8,185,611, and 8,364,839;

f) Awarding costs in this action to Plaintiff; and

g) For such other and further relief as the Court may deem just and proper.

Dated:   July 29, 2014                    RONALD ABRAMSON
                                          DAVID G. LISTON
                                          LEWIS BAACH PLLC
                                          The Chrysler Building
                                          405 Lexington Avenue
                                          New York, NY 10174

                                          By: s/ Ronald Abramson
                                                Ronald Abramson
                                          Tel: (212) 822-0163

                                          By: s/ David G. Liston
                                                David G. Liston
                                          Tel: (212) 822-0160

                                          *Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

On this 29th day of July, 2014, I certify that I served upon counsel for

Defendants herein a copy of the foregoing First Amended Complaint via the Court's

ECF filing system.

Dated: July 29, 2014

s/ Ronald Abramson

Ronald Abramson

**LEWIS BAACH pllc**

The Chrysler Building

405 Lexington Avenue

New York, NY 10174

Tel: (212) 826-7001
